# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHGAN

Election Integrity Fund,
Linda Lee Tarver,
Kirklyn Valentine, and
Jim Miraglia,                                        Case No. 1:20-cv-00950

                     Plaintiffs,          Honorable Paul L. Mahoney
v.                                                   Magistrate Judge Ray Kent

City of Lansing, City of Flint,

                Defendants.

_____

# DEFENDANTS' RESPONSE TO
# PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................1

BACKGROUND .............................................................................................2

I.   Factual Background ...............................................................................2

    A.   CTCL's COVID-19 Response Grant Program ...............................2
    B.   CTCL's Grants to Defendants ........................................................4
    C.   This Litigation ...............................................................................7

II.  Legal Background .................................................................................8

    A.   Elections Clause .............................................................................8
    B.   Help America Vote Act (HAVA) ...................................................8
    C.   National Voter Registration Act (NVRA) .....................................9
    D.   Section 168.931 of Michigan Election Law ................................10

ARGUMENT ................................................................................................10

    I.   Plaintiffs cannot establish a likelihood of success on the merits. ...................11

        A.   Plaintiffs lack standing ...............................................11
        B.   Plaintiffs lack a cause of action for their claims .................14

    II.  Plaintiffs cannot show a likelihood of irreparable harm and the remaining equitable factors weigh heavily against granting a preliminary injunction ..30

        A.   Irreparable harm ........................................................30
        B.   The balance of the equities and the public interest .............30

CONCLUSION .............................................................................................32

## INDEX OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abney v. Amgen, Inc.*,
   443 F.3d 540 (6th Cir. 2006) ............................................................... 30

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ............................................................................ 15

*Am. Civil Rights Union v. Philadelphia City Commissioners*,
   872 F.3d 175 (3d Cir. 2017) ............................................................... 16

*Armstrong v. Exceptional Child Center., Inc*
   575 U.S. 320 (2015) ........................................................................... 15

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ............................................................................. 8, 9

*Bellitto v. Snipes*,
   935 F.3d 1192 (11th Cir. 2019) .......................................................... 16

*Board of Education of Kiryas Joel Village School District v. Grumet*,
   512 U.S. 687 (1994) ........................................................................... 29

*Brunner v. Ohio Republican Party*
   555 U.S. 5 (2008) .............................................................................. 15

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009) ........................................................................... 29

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................... 12

*Colorado Common Cause v. Davidson*,
   No. 04 Civ. 7709, 2004 WL 2360485 (Colo. Dist. Ct. Oct. 18, 2004) ................... 26

*Cook v. Gralike*,
   531 U.S. 510 (2001) ........................................................................... 20

*Cooper ex rel. Eiland v. Guiterrez*,
   No. 312526, 2014 WL 465713 (Mich. Ct. App. Feb. 4, 2014) ............... 19

*Courser v. Allard*, 969 F.3d 604 (6th Cir. 2020) ................................ 18

*Crowley v. Nevada ex rel. Nevada Sec'y of State*,
   678 F.3d 730 (9th Cir. 2012) ............................................................. 25

*Democratic Nat'l Committee v. Republic Nat'l Committee*,
   673 F.3d 192 (3d Cir. 2012) ........................................................ 22, 25

*Dobrovolny v. Nebraska*,
   100 F. Supp. 2d 1012 (D. Neb. 2000) ................................................ 17

*Dykes v. Marshall*,
   No. 11 Civ. 1167, 2016 WL 1059618 (W.D. Mich. Mar. 17, 2016) ......... 18

*Epps v. 4 Quarters Restoration LLC*,
   498 Mich. 518 (2015) ........................................................................ 18

*Ferguson v. City of Charleston*,
   532 U.S. 67 (2001) ............................................................................. 29

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) .............. 22

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ............................................................................................ 19
*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................................... 12
*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) ............................................. 9, 26
*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................ 14
*Kuznik v. Westmoreland County Bd. of Cm'rs*,
    902 A.2d 476 (Pa. 2006) .................................................................................... 25
*League of Women Voters v. Blackwell*,
    340 F.Supp.2d 823 (N.D. Ohio 2004) ............................................................. 15
*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 11
*Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*,
    467 U.S. 461 (1984) ............................................................................................ 23
*Myers v. City of Portage*,
    304 Mich. App. 637 (2014) ................................................................................ 18
*Ne. Ohio Coal. for Homeless & S.E.I.U., Local 1199 v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) ............................................................................ 11
*Nickels v. Grand Trunk W. R.R.*,
    560 F.3d 426 (6th Cir. 2009) ............................................................................ 24
*Parker v. Dacres*,
    130 U.S. 43, 50 (1889) ...................................................................................... 31
*Parsad v. Granholm*,
    No. 1:08 Civ. 962, 2009 WL 10677876 (W.D. Mich. Mar. 30, 2009) .................... 21
*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ................................................................................................ 32
*Republican National Committee v. Democratic National Committee*,
    140 S. Ct. 1205 (2020) ...................................................................................... 31
*Sandusky Cty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ............................................................................ 23
*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...................................................................................... 14
*St. Joseph Twp. v. City of St. Joseph*,
    373 Mich. 1 (1964) ............................................................................................ 27
*Story v. Hargett*,
    No. 15 Civ. 2540, 2016 WL 519133 (W.D. Tenn. Jan. 12, 2016) ........................ 9
*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................ 11
*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................ 14
*Washington Ass'n of Churches v. Reed*,
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) ...................................................... 25
*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) ............................................................................ 11

*Wilson v. Williams*,
    961 F.3d 829 (6th Cir. 2020) ................................................. 11
*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, (2008).................................................................. 10
*Young v. Red Clay School District*
    520 U.S. 273 (1997).............................................................. 29

## Rules and Statutes

Mich. Comp. Laws § 168.931.................................... 10, 13, 18, 19, 27, 28
Mich. Comp. Laws § 168.934.............................................................. 10
52 U.S.C. § 20901 *et seq*................................................................... 8
52 U.S.C. §§ 21801-21102 ................................................................ 9

## Other Authority

*The State and Local Role in Election Administration: Duties and Structures* 1 (2019).............. 21
U.S. Const. art. 1, § 4, cl. 1 ............................................................... 8
*Help America Vote Act*, U.S. ELECTION ASSISTANCE COMM'N,
    https://www.eac.gov/about_the_eac/help_america_vote_act.aspx............................ 9

## INTRODUCTION

The Cities of Lansing and Flint have developed comprehensive plans to ensure that all of their residents can safely, securely, and efficiently cast their ballots in the upcoming election. In developing these plans, Lansing and Flint have recognized that the COVID-19 pandemic requires enhancements and modifications to existing election administration systems. That includes buying personal protective equipment for poll workers; recruiting and training new pollworkers (and in some cases providing them with hazard pay); meeting heightened demand for early and mail voting alternatives; purchasing high-speed tabulators for an anticipated surge in absentee ballots; and educating the public about these updated procedures. These measures are critical. They are also expensive. And like many cities and countries across the country, Lansing and Flint bear most of the cost of administering elections; state and federal contributions come nowhere close to ensuring sufficient funds for local election systems, especially under these extraordinary circumstances. Therefore, Lansing and Flint—like 381 different cities and townships of all political orientations throughout Michigan—applied for and accepted election administration grants from a non-partisan, non-profit organization (the Center for Technology and Civic Life). Those grant funds have already been put to use in both cities as part of comprehensive programs meant to ensure that all city residents, no matter their political orientation, can vote more safely and efficiently.

In this lawsuit, three individuals and an organization calling itself the Election Integrity Fund have filed a motion seeking a preliminary injunction to prohibit Lansing and Flint from using any CTCL grant money. This motion should be denied for numerous reasons.

As threshold issues, Plaintiffs lack Article III standing. They also lack causes of action to pursue their claims. And all of their legal theories collapse when measured against statutory and constitutional text. Moreover, Plaintiffs have not demonstrated any risk of irreparable harm—and

the remaining equitable factors tilt decisively against granting relief that would disrupt election administration in both cities at this late stage.

## BACKGROUND

I.    **Factual Background**

      A.    **CTCL's COVID-19 Response Grant Program**

The Center for Tech and Civic Life ("CTCL") is nonpartisan non-profit organization that promotes election modernization and civic engagement. (Ex. 1, CTCL, Our Story, https://www.techandciviclife.org/our-story.) Since its founding in 2012, it has provided trainings and support to local election officials to enable them to more effectively serve voters in their communities. (Ex. 2, CTCL, Our Work: Election Officials, https://www.techandciviclife.org/our-work/election-officials.) It has also collected and disseminated data to make elections and election processes more accessible and transparent to the public.  (Ex. 3, CTCL, Our Work: Civic Data, https://www.techandciviclife.org/our-work/civic-data.) Its leadership is bipartisan and its Board of Directors and Advisory Committee includes members affiliated with both major political parties or no political party at all, as well as nonpartisan election administrators from around the country. (Ex. 4, CTCL, Board of Directors, https://www.techandciviclife.org/board-of-directors; Ex. 5, CTCL, Advisory Committee, https://www.techandciviclife.org/advisory-committee.)

In 2020, CTCL recognized that election administrators throughout the country faced unprecedented challenges in adapting to the global COVID-19 pandemic. In response, it created a COVID-19 Response Grant Program that offers funding to local election administrators to enable them to provide safe and secure voting procedures during the COVID-19 global pandemic. (Kaardal Decl., Exs. A, B; Ex. 6, CTCL Statement on the Amistad Project, https://www.techandciviclife.org/amistad-statement.)

The COVID-19 Response Grants can be used for a range of nonpartisan administrative purposes. These include covering expenses associated with: (1) ensuring safe and efficient operation of polling places on Election Day, including supplying protective equipment and disinfectant, (2) recruiting and training poll workers, including providing them hazard pay, (3) meeting demand for early and mail voting alternatives, and (4) educating and informing voters about updated voting procedures. (Kaardal Decl., Ex. A at 4-5.) Localities decide how the funds are to be spent within those broad parameters. (*See* Kaardal Decl., Ex. A at 4-5, 7-8.)

These grants are available to any local election office anywhere in the country that chooses to apply. (Ex. 6, CTCL Statement on the Amistad Project.) Jurisdictions that apply need only provide basic information such as the number of registered voters and their existing budgets; no partisan criteria are considered. (Kaardal Decl., Ex. A at 5-6.) CTCL guarantees every applicant a minimum grant of $5,000 and has publicly committed to approving every eligible election department that applies, subject only to verification that the applicant is legitimate. (Ex. 6, CTCL Statement on the Amistad Project.) A diverse array of more than 1,100 municipalities from around the country have so far taken CTCL up on its invitation by applying for a grant. (*Id.*) That includes a total of 381 different cities and townships throughout Michigan of all different political stripes and inclinations. (Ex. 7, CTCL Statement on the Amistad Project, PDF, https://www.techandciviclife.org/wp-content/uploads/2020/10/10.5.2020-Amistad-Project-1.pdf.)

On September 1, 2020 the Office of the Secretary of State sent an e-mail advising municipal election administrators throughout the state of the CTCL grant program and encouraging them all to apply for funding.  The Secretary of State also sent additional emails regarding CTCL grants on

September 3, 8, 16, and 22, 2020. (Ex. 8, Lansing Decl. ¶ 3; Ex. 9, Flint Decl. ¶ 3; *see also* Ex. 10, SOS Emails.)

### B.      CTCL's Grants to Defendants

Defendants are two of the 381 Michigan municipalities that applied for and received COVID-19 Response Grants from CTCL. The Lansing City Clerk's Office announced its receipt of a $443,742 grant on September 4, and the Flint City Council approved receipt of a $475,625 grant on September 14. (Kaardal Decl., Exs. C, E.) As described below, both defendants have since received the funds and spent them or committed to spending them on transparent and nonpartisan administrative measures designed to promote safe and secure voting.

### 1.      City of Lansing

Like many other cities, Lansing has recognized that it will face unprecedented challenges in adapting voting procedures to ensure that all city residents have the opportunity to vote safely and securely during the pandemic. After election administrators experienced higher-than-anticipated vote-by-mail turnout during an August primary election, they expected a roughly four-fold increase in demand for mail balloting alternatives in the November general election. (Ex. 11, City of Lansing Safe Voting Plan 2020 at 1, 2.) Because mail balloting is generally more expensive than in-person voting, these rapid shifts in voter behavior created steep new administrative costs at the same time as municipal budgets were hard hit by economic downturn. (*Id.*) While Lansing is eligible for reimbursement of some expenses from the federal CARES Act, those sources of funding still left significant shortfalls. (Ex. 8, Lansing Decl. ¶ 4.)

When Lansing became aware of the CTCL COVID-19 Response Grant program, it recognized that this program could help alleviate budget constraints that were impeding its response efforts. (*Id.* at ¶ 5.) The City of Lansing Clerk's Office developed a detailed Safe Voting

Plan and applied for the necessary funding to carry it out. (*Id*.) Its grant was approved and, on September 4, announced by the City of Lansing Clerk's Office. (Kaardal Decl., Ex. C.) The Clerk's Office explained that the funds would be used to support a range of nonpartisan administrative expenses consistent with the City of Lansing's Safe Voting Plan. (*Id.*; *see also* Ex. 8, Lansing Decl. ¶ 5; Ex. 11, City of Lansing Safe Voting Plan 2020.) Those uses included pollworker training and recruitment; funding hazard pay and purchases of personal protective equipment for poll workers; the creation of additional in-person voting locations and mail ballot dropbox locations; informational campaigns  designed to educate voters about the changes; and the deployment of technology and resources to expedite and improve the accuracy of mail balloting, including the purchase of high-speed tabulators for an anticipated surge in absentee ballots. (Kaardal Decl., Ex. C; Ex. 11, City of Lansing Safe Voting Plan 2020.)  These plans benefit residents throughout the City.  (*Id.*)  The City of Lansing has been committed, and will remain committed, to implementing all new voting procedures in a nondiscriminatory manner that ensures all city residents who are eligible to vote can benefit from the adapted voting procedures these funds enable. (Ex. 8, Lansing Decl. ¶ 6.)

The City Council approved receipt of the funds on September 14, 2020. (*Id.* at ¶ 8.) The City received the funds on September 17, 2020 and immediately began putting them to use to meet the needs described. (*Id.* at ¶ 9.) To date, the Clerk's office estimates that 70% of the grant has already been spent, and early and absentee voting is already underway under plans created in reliance on the availability of these funds. (*Id.* at ¶ 12.) The City has purchased high-speed

tabulators it could not otherwise afford, and committed considerable sums already to make voters aware of ballot drop boxes and satellite offices enabled by the grant funds. (*Id.* at ¶ 12.)[1]

## 2.      City of Flint

Like Lansing, the City of Flint faces many challenges in preparing to administer the upcoming election. Primary elections earlier this year saw an increase in both voter turnout and absentee ballot requests, and the City expected more of those changes in the general election. At the same time, the City is experiencing lost income and sales tax revenue due to the pandemic and economic downturn. (Ex. 9, Flint Decl. ¶¶ 4-6.)

After recognizing this dire situation, the City of Flint Clerk's Office prepared a "City of Flint Safe Voting Plan" assessing the city's unmet voting needs during the pandemic. (*Id.* at ¶ 7; Ex. 13, Flint Safe Voting Plan.) Like City of Lansing officials, City of Flint officials recognized that CTCL's COVID-19 Response Grant program could alleviate budget pressures that impeded their ability to realize those plans. (Ex. 9, Flint Decl. ¶ 7.)

On September 10 CTCL notified the City of Flint by letter that it had been approved to receive a grant in the amount of $475,625. (*Id.* at ¶ 8; *see also* Kaardal Decl., Ex. D.)  On September 14, the Flint City Council authorized the Clerk's Office to accept and use the grant in support of the Safe Voting Plan. (Kaardal Decl., Ex. E.) The Safe Voting Plan identifies a range of nonpartisan administrative expenses for which the funds will be used, including: postage and mailing expenses, additional staff and high-speed tabulators to increase capacity for processing mail ballots, other logistical support for expanded early and mail voting, and additional resources

---

[1] Subsequent experience has led the City Clerk's Office to identify additional needs, and so Lansing has requested an additional $44,648. (Ex. 8, Lansing Decl. ¶ 11; Ex. 12, Safe Voting Plan Amendment.) That pending request would provide for additional health and safety measures, including socially distanced drive-through voter registration and early voting options and air-circulation upgrades at a heavily trafficked indoor election facility. *Id.*

for pollworker recruitment and training. (Ex. 9, Flint Decl. ¶¶ 11, 14; Ex. 13, Flint Safe Voting Plan.)  As in Lansing, these adapted services are necessary to meet sharply increased demand for mail balloting and drop-off alternatives, which are costlier to provide than single-day in person voting. (Ex. 13, Flint Safe Voting Plan.)  For those voters who do vote in person, new training, personnel, and protective equipment are essential to ensure that all residents and pollworkers (including elderly and vulnerable individuals) can cast and process ballots safely.  (*Id.*)

The City received the funds on September 25, 2020 and immediately began putting them to use to meet the needs described. (Ex. 9, Flint Decl. ¶ 12.) As of October 12, 2020, roughly a quarter of the grant  has already been spent, and early and absentee voting is already underway under plans created in reliance on the availability of these funds. (*Id.* at ¶ 13.)

### C.     This Litigation

On September 29, 2020, this lawsuit was filed by three individuals and an organization calling itself the Election Integrity Fund. Individual plaintiffs Linda Lee Tarver, Kirklyn Valentine, and Jim Miraglia are each alleged to be voters who live in Lansing or Flint—and, as a result, each of them stands only to *gain* from the safer and more efficient voting procedures in those cities that the grants will make possible. Compl. ¶¶ 5-8. Each allegedly "opposes the election of progressive candidates in local, state, and federal elections"; no other information is provided about them. *Id.* The Election Integrity Fund is alleged to be a membership organization that aims to promote the integrity of Michigan elections, and to protect the rights of its members. *Id.* ¶ 4. Those members are alleged to include unspecified candidates for elective office and the three individual plaintiffs. *Id.*

Plaintiffs contend that the acceptance and use of supplemental funding for local election administration from private grants violates a categorical ban on nongovernmental funding that they

contend is unstated but implicit somewhere in the penumbras of the Elections Clause, the Supremacy Clause, the U.S. Constitution generally, two federal election-modernization statutes, a Michigan state criminal statute, or some combination of all of the foregoing. Compl. ¶¶ 69-150.

On September 30, plaintiffs moved for a Temporary Restraining Order. ECF Nos. 5-6. This Court denied that motion on October 2. ECF No. 11. It concluded that plaintiffs did not meet their burden to show a likelihood of success on the merits because their motion identified no language in the Constitution or any of the cited statutes "that explicitly prohibits cities from accepting private grants to administer elections," and "[o]n the Court's review, no such explicit prohibition exists." *Id.* at 2. The Court also concluded that plaintiffs had failed to identify any "immediate, irreparable harm" to justify an immediate TRO. *Id.* The Court then construed the TRO motion and supporting documents as a motion for preliminary injunction and requested this response. *Id.* at 2-3.

## II.     Legal Background

### A.     Elections Clause

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. 1, § 4, cl. 1. Simply stated, the Elections Clause requires the States to prescribe the "time, place, and manner" of holding congressional elections, but allows Congress to preempt those choices. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013).

### B.     Help America Vote Act (HAVA)

Congress passed the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, "to improve the electoral system in the United States following the November 2000 election." *See*

*Story v. Hargett*, No. 15 Civ. 2540, 2016 WL 519133, at *2 (W.D. Tenn. Jan. 12, 2016). To that end, HAVA created new mandatory minimum standards for state election administration. It also provided states with funding to meet those standards, to replace their voting systems, and to make overall improvements to election administration. The most significant substantive mandates of the Act are contained in Title III, which imposes requirements on states concerning voting equipment, registration databases, provisional voting, and voter identification. *See* 52 U.S.C. §§ 21801-21102.

In addition, HAVA established the Election Assistance Commission (EAC) to assist the states in complying with the Act and to distribute HAVA funds to them.[2]  The Act requires each state to develop a plan for compliance with HAVA's substantive requirements in order to receive funding from EAC, *id.* § 21003.[3]

Finally, HAVA also establishes two forms of potential remedies if its requirements are not met: (1) the U.S. Department of Justice can seek declaratory or injunctive relief to carry out the requirements in Title III; and (2) the states must establish administrative complaint procedures by which a complainant can seek to remediate Title III violations. *See id.* §§ 21111-21112.

### C.   National Voter Registration Act (NVRA)

The National Voter Registration Act (NVRA) "regulates voter registration." *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012). In particular, the NVRA "requires States to provide simplified systems for registering to vote in federal elections," including voter registration by mail, at various state offices, and on a driver's license application. *Young v. Fordice*, 520 U.S. 273, 275-76 (1997) (emphasis omitted); *see* 52 U.S.C. §§ 20503-20508. "The NVRA specifies various

---

[2]   *See Help America Vote Act*, U.S. ELECTION ASSISTANCE COMM'N, https://www.eac.gov/about_the_eac/help_america_vote_act.aspx.

[3] States may decline to receive federal funds under HAVA, but then they must file a compliance plan with the Department of Justice. *See* 52 U.S.C. § 21112(b).

details about how these systems must work, including, for example, the type of information that States can require on a voter registration form." *Young*, 520 U.S. at 276; *see* 52 U.S.C. § 20508.

Each state must designate an employee as the "chief State election official" to coordinate the state's responsibilities under the NVRA. *Id.* § 20509. "A person who is aggrieved by a violation" of the Act "may provide written notice of the violation to the chief election official of the State involved." *Id.* § 20510(b)(1). This exhaustion requirement is a statutory prerequisite to filing suit under the NVRA. *See id.* § 20510(b)(2) (providing that, if the violation "occurred within 120 days before the date of an election for Federal office" and "the violation is not corrected within . . . 20 days after receipt of the notice," then "the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation).

### D. Section 168.931 of Michigan Election Law

Section 168.931 of Michigan Election Law bans vote buying by declaring it to be a criminal misdemeanor. Thus, under § 168.931, a "person shall not, either directly or indirectly, give, lend, or promise valuable consideration, to or for any person, as an inducement to influence the manner of voting by a person relative to a candidate or ballot question, or as a reward for refraining from voting." *Id.* The penalties for violating § 168.931 may include "a fine of not exceeding $500.00, or . . . imprisonment in the county jail for a term not exceeding 90 days, or both such fine and imprisonment in the discretion of the court." *See* Mich. Comp. Laws § 168.934.

### ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[T]he likelihood of success on the merits often

will be the determinative factor." *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020). Here, Plaintiffs fail to satisfy any of the four factors. This Court should deny their motion.

## I.     Plaintiffs cannot establish a likelihood of success on the merits.

Plaintiffs are unlikely to succeed on the merits for three reasons. First, they are unlikely to demonstrate standing. Second, they are unlikely to show that they have a cause of action for their claims. And finally, they are unlikely to succeed on the merits of any of their claims.

### A.     Plaintiffs lack standing.

In order to obtain a preliminary injunction, plaintiffs bear the burden of establishing a likelihood that at least one of them has Article III standing. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 (6th Cir. 2018). This requires them to establish (1) a concrete and particularized injury-in-fact, (2) a causal connection between that injury and the challenged conduct, and (3) redressability. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). Plaintiffs have not carried their burden for at least three independent reasons.

*First*, plaintiffs have provided none of the evidence necessary for the court to even evaluate their standing. Pleadings alone are insufficient when seeking injunctive relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have submitted no evidence to establish even the rudimentary facts mentioned in their complaint, such as where the individual plaintiffs live and vote or what candidates they do and do not support. Nor is there any evidence concerning the Election Integrity Fund's activities or membership. Plaintiffs have made no effort to establish that they are proper parties to bring these claims, and the Court can deny the requested injunction on that ground alone. *See Ne. Ohio Coal. for Homeless & S.E.I.U., Local 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006); *see also id.* at 1012 (McKeague, J., concurring) (emphasizing that a

plaintiff cannot obtain an emergency injunction "which has the effect of disrupting an ongoing election process" on the basis of "allegations admittedly unsupported by evidence").

*Second*, even taking plaintiffs' unsworn standing arguments at face value, they have failed to assert any cognizable injury-in-fact. Plaintiffs contend that they are harmed because Defendants' acceptance of these private election-administration grants will "skew" the "outcome" of the November 3, 2020 election toward candidates they disagree with. PI Mot. at 15; *see also id.* at 29-30. But that "abstract interest" in the policy outcome of an election is an "'undifferentiated, generalized grievance'" "common to all members of the public"; it is therefore not "an individual and personal injury of the kind required for Article III standing." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). Simply stated, democracy is not an injury. There is no merit to Plaintiffs' suggestion that they are injured within the meaning of Article III by actions that make safe, secure, and efficient voting more readily available to all residents of Lansing and Flint (even if Plaintiffs believe that their preferred candidates are less likely to prevail if more citizens vote). If anything, Plaintiffs themselves are better off, rather than injured, as a result of Lansing and Flint receiving grants to support superior election administration. Plaintiffs' abstract policy preference that voting should be more onerous and less safe for their fellow city residents—in hopes that this aids their favored candidates—is not a substitute for concrete, personal injury-in-fact.

*Third*, even if Plaintiffs have identified a cognizable harm, they have not carried their additional burden of showing that any such Article III injury is "'actual or imminent, not conjectural or hypothetical.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560 (Scalia, J.)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (Alito, J.). That is true for two separate reasons. The first is that Plaintiffs' theory rests on erroneous factual premises: while Plaintiffs imply that the results of the November 3 election will be skewed by

CTCL's grants because they are targeted to "certain progressive cities," Plaintiffs offer no evidence to support that theory, which is contradicted by the fact that 381 municipalities in Michigan (of all political stripes) have taken up CTCL on its offer of election administration assistance. (*See* Ex. 7, CTCL Statement on the Amistad Project, PDF.) Plaintiffs have submitted a report which asserts that only eleven Michigan municipalities are grant recipients (cherry-picking cities that fit their narrative), but that "fact" remains entirely unattributed and—as CTCL's most recent disclosures make clear—is completely inaccurate.  (*See* 2d Kaardal Decl., Ex. M at 8, 11-12.)  Thus, to the extent Plaintiffs' Article III standing rests on the premise that the grant program will skew outcomes, that factual premise is both unsupported and wrong. Yet there is a second, related flaw in this theory: it relies on an extended chain of speculative and uncorroborated inferences about how the presence or absence of these funds might affect the behavior of third parties (including election administrators and voters in jurisdictions throughout Michigan), and what collective impact those myriad decisions might have on election results. Nothing about that chain of inferences indicates an *imminent* injury. *See Clapper*, 568 U.S. at 410 (no standing where plaintiffs relied on "a highly attenuated chain of possibilities").[4]

---

[4] Alternatively, if Plaintiffs instead meant to suggest that receipt of these funds could somehow influence election administrators to "skew" results *within* Flint and Lansing, there is no evidence whatsoever to support Plaintiffs' baseless and inflammatory innuendo. Despite Plaintiffs' flippant invocation of criminal bribery statutes, they have put forward no evidence of any corruption or wrongdoing in connection with these grants, and Defendants are not aware of any. (Ex. 8, Lansing Decl. ¶ 13; Flint Decl. ¶ 15.)  Both Defendants have been transparent about the precise public purposes for which the funds will be used.  (Kaardal Decl., Exs. C, E; *see also* Ex. 11, Lansing Safe Voting Plan; Ex. 12, Flint Safe Voting Plan.)  And Plaintiffs have offered no explanation whatsoever how the availability of additional funding for administrative expenses and voter education could induce city officials "'to influence the manner of voting by a person relative to a candidate or ballot question.'" PI Mot. at 28 (quoting Mich. Comp. Laws § 168.931). Any suggestion of impropriety is therefore unfounded, offensive, and woefully inadequate to support Article III standing.

Perhaps recognizing that their claims of injury and causation are deficient, Plaintiffs alternatively contend that they have no burden to show concrete and particularized injury to themselves so long as they allege a violation of HAVA and a private cause of action to enforce it. PI Mot. at 13-15. That is not the law. Even if Plaintiffs could show a statutory violation and a cause of action to enforce it—and as discussed below, they have not—that would not give rise to Article III standing. "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

For all the reasons just discussed, plaintiffs have neither pleaded nor proved the concrete and particularized injury that Article III requires—and so their motion should be denied.[5]

**B.      Plaintiffs lack a cause of action for their claims.**

Plaintiffs allege that CTCL's grants are unlawful under the Supremacy Clause, the Elections Clause, HAVA, the NVRA, and the Michigan bribery statute. Plaintiffs lack a cause of action and therefore are not likely to succeed on the merits of any of their claims.

**1.      Plaintiffs lack a cause of action under the Supremacy Clause**

Plaintiffs appear to suggest that their claims rest upon a cause of action derived from the Supremacy Clause of the Constitution. *See* PI Mot. 12-13 (citing *League of Women Voters v.*

---

[5] The foregoing analysis applies to both the individual plaintiffs and the Election Integrity Fund. As a membership association, the Election Integrity Fund needs to show standing either "in its own right" or "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). But it has asserted no harm to its own interests. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). And the Election Integrity Fund can assert a claim on behalf of plaintiffs (its only identified members) only if they would independently have Article III standing, which they do not.

*Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004)). But the Supreme Court unanimously held in *Armstrong v. Exceptional Child Center., Inc.* that "the Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." 575 U.S. 320, 324-25 (2015) (Scalia, J.). Plaintiffs cannot show that they are likely to succeed based on this cause of action.[6]

## 2.    Plaintiffs lack a cause of action under the HAVA.

Nor can Plaintiffs establish a likelihood of success in showing that HAVA provides them with a private cause of action. *See* PI Mot. 13. In *Brunner v. Ohio Republican Party*, the Supreme Court reversed a TRO granted to a private plaintiff alleging a materially indistinguishable HAVA violation: "[R]egardless of whether HAVA [was] being properly implemented," it held, the plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized [a federal court] to enforce [the relevant HAVA provision] in an action brought by a private litigant." 555 U.S. 5, 6 (2008) (per curiam). *Brunner*'s holding followed inexorably from its citation to *Alexander v. Sandoval*. *See id.* There, the Supreme Court explained that "private rights of action to enforce federal law must be created by Congress," and "statutory intent on this . . . point is determinative." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (Scalia, J.). In other words, a private cause of action does not exist unless a statute displays a clear Congressional intent to create a private right and remedy. And in analyzing whether Congress intended to create a private right and remedy under a federal statute, the statutory "text and structure" are key. *Id.* at 288. For example, where a statute makes "express provision [for] one method of enforcing a substantive rule," courts take this to mean "that Congress intended to preclude others." *Id.* at 290.

---

[6] Although Plaintiffs assert that CTCL's grants are also preempted by the Elections Clause, PI Mot. 15, 21-22, they do not argue that the Elections Clause provides a cause of action for their claims, as they instead rely on their (incorrect) assertion that the Supremacy Clause does so, *id.*

Applying these principles, the Sixth Circuit has held that HAVA "does not itself create a private right of action." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004); *see also Am. Civil Rights Union v. Philadelphia City Commissioners*, 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA does not include a private right of action that allows aggrieved parties to sue nonconforming states."); *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("HAVA creates no private cause of action."). Plaintiffs seek to escape those holdings by citing HAVA's remedy provision, which obligates states receiving HAVA funds to provide an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)." PI Mot. 14 (quoting 52 U.S.C. § 21112). Plaintiffs claim that Michigan's complaint process is "legally insufficient" to satisfy its obligations to create an administrative remedy under § 21112. But even if this were true (and it is not), Plaintiffs' logic would fail for two reasons. First, it flips *Sandoval* on its head: a provision expressly identifying state administrative processes as the forum for raising complaints cannot somehow impliedly create an atextual private right of action where that process is allegedly deficient. Second, Plaintiffs' theory disregards the availability of an independent means of enforcing HAVA under the statute—namely, a civil action brought by the Attorney General—which likewise precludes inferring a private right of action. *See Bellitto*, 935 F.3d at 1202 (citing 52 U.S.C. §§ 21111, 21112); *see also Sandoval*, 532 U.S. at 290 (express statutory regime for enforcement by federal agencies precludes existence of private right of action).

Accordingly, Plaintiffs have not overcome the wall of authority holding that there is no private cause of action under HAVA—and thus are decidedly unlikely to succeed on that claim.

### 3.     Plaintiffs lack a cause of action under the NVRA.

Plaintiffs do not claim to have a cause of action under the NVRA, though they do argue that the NVRA preempts CTCL's grants. PI Mot. 27. At any rate, Plaintiffs' claim under the NVRA is unlikely to succeed because they do not meet two of the statute's requirements for a private cause of action. First, the NVRA requires that a person be "aggrieved" by a violation of the statute in order to pursue a private right of action in federal district court. 52 U.S.C. § 20510. For the same reasons that they failed to show Article III standing, *see supra* 11-14, Plaintiffs are not "aggrieved" by the alleged violation of the NVRA. *See Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1031 (D. Neb. 2000) ("Persons 'aggrieved' by a violation of the NVRA are persons who allege that their right to vote in an election for federal office have been impaired by a violation of the NVRA."). Indeed, Plaintiffs concede—through their allegations—that receipt of the grants will make it *easier* to register and vote safely in the election. It is therefore inconceivable that they are "aggrieved" under a law designed to improve voter registration procedures, *see* 52 U.S.C. § 20501—and so they lack a statutory cause of action to pursue their NVRA claim against Lansing and Flint.

Second, the conclusion that Plaintiffs lack a statutory cause of action is also independently required by Plaintiffs' failure to allege or provide any evidence that they complied with the NVRA's exhaustion provision. *See id.* § 20510(b). "A person who is aggrieved by a violation of [the NVRA] may provide written notice of the violation to the chief election official of the state involved." 52 U.S.C. § 20510(b)(1). Here, Plaintiffs allege that Lansing and Flint violated the NVRA by "accept[ing]" CTCL's grants. *See* Compl. ¶¶ 127, 128, 134, 135, 142. Lansing and Flint accepted their grants on September 14 and 16, respectively. (Ex. 8, Lansing Decl. ¶ 8; Ex. 9, Flint. Decl. ¶ 9.) Because the alleged violation "occurred within 120 days before the date of an election for Federal office" and more than 30 days before such an election, the NVRA provides that "the

aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation" if "the violation is not corrected within . . . 20 days after receipt of the notice." *Id.* § 20510(b)(2). Here, Plaintiffs offer no proof that they fulfilled the NVRA's notice provision by "provid[ing] written notice of the violation" to Michigan's chief election official. Therefore, adhering to the plain text of the statute, they cannot proceed in federal court under the NVRA.

### 4. Plaintiffs lack a cause of action under Michigan's misdemeanor election bribery statute.

Plaintiffs do not assert that a private right of action exists to enforce Michigan's state law on election bribery, Mich. Comp. Laws § 168.931, and therefore they have waived any argument that such a private right of action exists. *Dykes v. Marshall*, No. 11 Civ. 1167, 2016 WL 1059618, at *3 (W.D. Mich. Mar. 17, 2016). In all events, any such argument is not likely to succeed.

Under Michigan law, "a criminal statute must *expressly* create a private cause of action, or one must be inferred from a lack of adequate means of enforcement." *Courser v. Allard*, 969 F.3d 604, 619 (6th Cir. 2020) (emphasis added); *see also Epps v. 4 Quarters Restoration LLC*, 498 Mich. 518, 535 (2015) ("By expressly conferring enforcement authority only on prosecutors and the Attorney General, the statute would seem by implication not to confer similar authority on a private party."). Moreover, "Michigan caselaw holds that no cause of action can be inferred against a governmental defendant." *Myers v. City of Portage*, 304 Mich. App. 637, 643 (2014).

Section 168.931, which identifies certain election-related misconduct as a misdemeanor, is "a criminal statute, with no civil component." *See Courser*, 969 F.3d at 619. It does not contain an "express" provision creating a private right of action. *Id.* Nor does it otherwise lack an adequate enforcement mechanism: it is enforceable by county prosecuting attorneys. *See* Mich. Comp. Laws § 168.940 ("It is hereby made the duty of every prosecuting attorney, whenever he shall receive

credible information that any such [election] offense has been committed, to cause the same to be prosecuted"); *see also Cooper ex rel. Eiland v. Guiterrez*, No. 312526, 2014 WL 465713, at *3 (Mich. Ct. App. Feb. 4, 2014) (no private right of action to enforce ordinance that provides for "criminal punishment, in the form of a misdemeanor charge"). Therefore, § 168.931 of Michigan's election law neither lacks "adequate means of enforcement" nor "expressly create a private cause of action," and no private right of action can be inferred, *especially* against government defendants. *See Courser*, 969 F.3d at 619; *Myers*, 304 Mich. App. at 643.

Accordingly, Plaintiffs are unlikely to succeed in establishing that they have a private right of action to enforce § 168.931. Their claims under § 168.931—much like their federal statutory and constitutional claims—cannot support preliminary injunctive relief.

### C.    Plaintiffs are unlikely to succeed on the merits

Plaintiffs' motion should be denied for lack of Article III standing and for lack of a cause of action. In the alternative, it should be denied because they cannot show a likelihood of success on the merits of any of their claims.

Plaintiffs make the novel, unsupported argument that Lansing and Flint cannot lawfully accept election-administration grant funds from a private source because those grants are "preempted" under various federal and state laws. *See* PI Mot. 21 (Elections Clause), 22 (HAVA), 25 (NVRA), 28 (Michigan election-bribery statute). In particular, Plaintiffs appear to proceed on a theory of "conflict preemption." *See* PI Mot. 12, 20 (HAVA), 26 (NVRA). But "conflict preemption" occurs only where "compliance with both federal and state regulations is a physical impossibility" or where the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). As we explain below, neither of those circumstances exist here.

### 1.      Elections Clause

Plaintiffs assert that the Elections Clause "preempt[s] CTCL's private federal election grants to local governments." PI Mot. 22. That claim is unlikely to succeed on the merits because the Elections Clause in no way restricts—or even relates to—how cities like Lansing and Flint fund federal election activities.

A glance at the Constitution confirms that nothing about the Elections Clause is implicated by this case. The Clause empowers states to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives" and allows Congress "at any time by law [to] make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The focus of the Elections Clause is the balance of authority between states and Congress in regulating federal elections. *See Inter Tribal Council*, 570 U.S. at 8. The Elections Clause says nothing about local government and nothing about how cities fund the administration of their election systems. Nor does its reference to the "Times, Place, and Manner of holding Elections" cover the circumstances here: the grants accepted by Lansing and Flint obviously do not affect the "times" or "places" of the election, and they do not affect its "manner" as that term has been interpreted by the Supreme Court. *See Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (taking the  "commonsense view" that regulation of the "manner" of federal elections "encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" (citation omitted)). To be sure, Lansing and Flint have adopted policies that relate to the "manner of the election," but the path through which they choose to fund those policies is not itself a constitutionally defined "manner" subject to federal constitutional regulation under the Elections Clause.

Tellingly, Plaintiffs identify no case in which a local government's source of funding (or any other local decisionmaking remotely analogous to that at issue here) was invalidated on Elections Clause grounds. We are not aware of any such case. To the contrary, as a recent Congressional Research Service report explained, local authority to fund election activities has long been a feature of federal election administration: "States typically have primary responsibility for making decisions about the rules of elections (policymaking). Localities typically have primary responsibility for conducting elections in accordance with those rules (implementation). Localities, with varying contributions from states, typically also have primary responsibility for paying for the activities and resources required to conduct elections (funding)." Cong. Research Service, *The State and Local Role in Election Administration: Duties and Structures* 1 (2019).

So the Elections Clause, which splits responsibility for elections between the federal and state governments, has nothing to do with this case. Plaintiffs err in arguing that any local election-related decision can be challenged on constitutional grounds based on an allegation it violates a state or federal statute; the Elections Clause does not provide a roundabout vehicle, or implied cause of action, to constitutionalize every issue in local election administration. And, in any event, there is no merit (as explained below) to Plaintiffs' various state and federal law allegations. Thus, Plaintiffs' claim under the Elections Clause is unlikely to succeed on the merits.

## 2.    HAVA

Plaintiffs are unlikely to succeed in arguing that Lansing and Flint's acceptance of CTCL grants is preempted by HAVA. Nothing about the cities accepting or using CTCL's private grant funds renders HAVA compliance impossible or stands as "an obstacle to the accomplishment and execution of the full purposes and objectives" of HAVA. *See Freightliner Corp.*, 514 U.S. at 287.

First, there is no provision in HAVA that explicitly or impliedly makes acceptance of private grant money "physically impossible." *Parsad v. Granholm*, No. 1:08 Civ. 962, 2009 WL 10677876, at *10 (W.D. Mich. Mar. 30, 2009). To the contrary, HAVA *contemplates* that states will receive funds from non-HAVA sources: it  requires state recipients of HAVA funds to keep records "which fully disclose the amount and disposition … of funds, the total cost of the project or undertaking for which such funds are used, and the amount of that portion of the cost of the project or undertaking *supplied by other sources*." 52 § U.S.C. 21142(a) (emphasis added). Thus, if anything, HAVA expressly envisions a role for non-HAVA funding in administering federal elections. There is no direct or implied conflict with the statute.

Second, Lansing and Flint's receipt of private grants does not stand as an obstacle to the accomplishment of HAVA's purposes. HAVA is principally "concerned with updating election technologies and other election-day issues at polling places." *Democratic Nat'l Committee v. Republic Nat'l Committee*, 673 F.3d 192, 211 (3d Cir. 2012). Lansing and Flint's acceptance and implementation of private funding from CTCL, which is directed at "ensuring [local election jurisdictions] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted," Compl. ¶ 42, does not impede HAVA's purposes. To the contrary, it actively furthers them.

Given this synergy between HAVA's purposes and the CTCL grants, it is unsurprising that Plaintiffs have not met their burden to establish a likelihood that HAVA conflicts with accepting the grants. Indeed, each purported "conflict" Plaintiffs identify lacks merit.

First, Plaintiffs claim that HAVA "does not legally authorize local governments to accept private federal election grants." PI Mot. 23. Even if true, that absence of express authorization does not give rise to federal conflict preemption. In *Florida State Conference of N.A.A.C.P. v.*

*Browning*, the Eleventh Circuit rejected an analogous argument from "negative implication," holding that Florida's voter registration statute—which conditioned registration on a new "matching" verification requirement—was not preempted by HAVA section 303(a), which governs state voter registration databases. 522 F.3d 1153, 1168 (11th Cir. 2008). As *Browning* emphasized, just because HAVA may not have intended to recommend, promote, or otherwise "prescribe matching as a federal precondition for voter registration," that does not mean that HAVA thereby impliedly "prohibit[s] states from implementing [matching]." *Id.*

*Browning*'s logic forecloses Plaintiffs' argument that the absence of express authorization in HAVA preempts Lansing and Flint's actions in accepting funding. There can be no conflict preemption unless Flight and Lansing's acceptance of the grants is "conduct that the federal Act forbids." *Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 478 (1984) (emphasis added); *see also Am. Civil Rights Union v. Phila. City Comm'rs*, Civ. A. No. 16-1507, 2016 WL 4721118, at *10 (E.D. Pa. Sept. 9, 2016), *aff'd*, 872 F.3d 175 (3d Cir. 2017) ("*ACRU*") (Because "the Court . . . thoroughly reviewed each potentially applicable section of . . . HAVA," and found "no conflict of laws," it held state law "cannot be preempted."). And Congress cannot be said to have *forbidden* cities from accepting private election grants by remaining silent on the topic in HAVA: If Congress intended to forbid states or municipalities from doing something—like accepting private grant money—one would expect Congress to say so clearly. *See Browning*, 522 F.3d at 1170; *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 578 (6th Cir. 2004) (Ambiguous phrases in HAVA are "an insufficient basis for inferring a congressional intent to impose federal requirements upon the States.").

As a fallback, Plaintiffs claim that Lansing and Flint violated HAVA because "CTCL's private federal election grants to local governments lead to deviations from the federally-approved

and state-approved election administration plans and budgets," including Michigan's EAC-approved HAVA plan. PI Mot. 23-24. But notably, Plaintiffs do not cite a *single* provision of HAVA in support of their contention that the state plan, or any of its required contents, expressly or impliedly prohibits *local governments* within those states from also accepting private grants (or from making judgments about the allocation of funds from their own general treasuries to cover election expenses). *See id.* That is because nothing in the HAVA provisions setting forth the conditions for receipt of funds, nor the required contents of the state plans submitted to EAC, says anything that prohibits cities from making their own determinations about the sources of funding for election systems. *See* 52 U.S.C. §§ 21003, 21004.[7] That forecloses Plaintiffs' argument.[8]

---

[7] To the extent that Plaintiffs imply that acceptance of CTCL's private grants somehow undermines the bi-partisan mission of the Electoral Assistance Commission because the voters in these cities may lean progressive, PI Mot. 23 ("Under HAVA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way."), that argument is baseless for two reasons. *First*, CTCL's funds are available to all municipalities that meet the same neutral requirements. *See* Compl. ¶ 47 ("If your U.S. election office is responsible for administering election activities covered by the grant, you're eligible to apply for grant funds."). Plaintiffs have not offered any evidence to the contrary. *Second*, any city's acceptance and use of CLTC funds would not undermine, or in any way impact, the bi-partisan make-up or mission of the Commission, regardless of whether Plaintiffs label that city "progressive" or not. The Commission would continue to operate in the same bi-partisan manner whether or not a particular municipality happens to accept CTCL funding.

[8] On October 12, 2020, the day before Defendants' opposition brief was due, Plaintiffs filed a declaration attaching a commissioned report on "The Legitimacy and Effect of Private Funding in State and Federal Electoral Processes." *See* ECF No. 14-3. This report not only fails to identify a conflict between acceptance of CTCL grants and any specific provision or purposes of HAVA, but it is also irrelevant the question of conflict preemption. "Whether a federal law preempts a state law or precludes another federal law is a question of law." *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009). The Court can decide this legal question on the briefs, without reference to factual averments in an extraneous consultants' report. There is no reason to countenance Plaintiffs' attempt to launder their illegitimate legal arguments through an attorney declaration. And besides, the facts in the report are incomplete—they identify only 10 of the more than 381 Michigan municipalities that received CTCL funding. *Compare* ECF No. 14-3 at 12, *with* Ex. 7, CTCL Statement on the Amistad Project, PDF, https://www.techandciviclife.org/wp-content/uploads/2020/10/10.5.2020-Amistad-Project-1.pdf.

Nor do Plaintiffs provide even one iota of support for the proposition that the acceptance of these grants somehow poses an obstacle to accomplishing HAVA's purposes. Perhaps that is because Plaintiffs misstate HAVA's purpose (again, without citing any authority). *Compare* PI Mot. 23 ("HAVA's purpose was to coordinate federal and state administration of federal elections."), *with Democratic Nat'l Committee v. Republic Nat'l Committee*, 673 F.3d 192, 211 (3d Cir. 2012) (explaining HAVA was concerned with "updating election technologies and other election-day issues at polling places."); *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) (listing purposes of HAVA and not listing federal-state coordination). Regardless, there is nothing about a city's acceptance of private grants that is inconsistent with— or even implicated by—any state/federal coordination objective set forth in HAVA. And to the extent these grants will allow Lansing and Flint to support enhancements to local election systems that bring the quality of election administration above the minimum standards in HAVA, that does not conflict with HAVA: the standards it sets are a *floor*, not a *ceiling*, and jurisdictions do not engage in activity that conflicts with HAVA when they undertake (or fund) improvements.

As *Browning* confirms, HAVA does not preempt state election law unless such compliance with such state laws renders simultaneous compliance physically impossible, or the state law "impedes HAVA's objectives." *Id.* at 1171; *accord ACRU*, 2016 WL 4721118, at *10 (Where "there is no conflict of laws," there "cannot be preempt[ion]."). That is demonstrably not the case here. And that principle explains why the authorities cited by Plaintiffs are inapposite: there, courts found conflict preemption under HAVA only because the relevant laws "directly conflict[ed] with [HAVA]." *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1269 (W.D. Wash.

2006)[9]; *see also Kuznik v. Westmoreland County Bd. of Cm'rs*, 902 A.2d 476, 479-80 (Pa. 2006) (holding that state law requiring referendum before purchase of replacement of lever voting machines was preempted by HAVA's express requirement "to *replace* lever machines with [electronic voting systems]"); *Colorado Common Cause v. Davidson*, No. 04 Civ. 7709, 2004 WL 2360485, at *11–12 (Colo. Dist. Ct. Oct. 18, 2004) (finding conflict preemption likely where HAVA's purpose to "insure that registered and eligible voters are allowed to vote provisionally, even though their names do not appear on polling place voting rolls" conflicted with a state law "categorically preclud[ing] provisional ballots from being counted if the voter had requested an absentee ballot"). Cases like these have no application here.

On issues that are "not specifically addressed by HAVA, Congress essentially punted to the states," and conflict preemption cannot apply. *Browning*, 522 F.3d at 1172. That principle dictates the outcome here. Therefore, Plaintiffs have not met their burden to establish that Lansing and Flint's acceptance of grants likely conflicts with HAVA.

### 3.   NVRA

Like HAVA, the NVRA does not somehow impliedly preempt the grants at issue here. Plaintiffs assert that the "NVRA does not *legally authorize* local governments to accept private federal election grants for voter registration." PI Mot. 26 (emphasis added). But again, that misstates the inquiry: the question is not whether the NVRA affirmatively authorizes receipt of these grants, but instead whether Lansing and Flint's conduct somehow make compliance with the

---

[9] *Reed*, which enjoined Washington State's "matching statute" requiring the state to match a potential voter's name to one of two specified databases before allowing that person to register to vote, is in tension with *Browning*'s approval of Florida's matching statute. But even following *Reed*'s approach instead of *Browning*'s, there can be no preemption here. Unlike the plaintiffs in *Reed*, Plaintiffs here do not point to any specific provision of HAVA that *directly* conflicts with Lansing and Flint's acceptance of CTCL grants. *Cf. Reed*, 492 F. Supp. 2d at 1269 (holding Washington's matching statute likely conflicts with three specific provisions of HAVA).

NVRA impossible or defeats the operation of the statute. On that score, Plaintiffs come up short. The four sections of the NVRA that Plaintiffs cite, *see* PI Mot. 25-26 (citing 52 U.S.C. §§ 20504-20507), do not prescribe or proscribe how local election-administration work may be funded. The statute is simply silent on the issue. That is no surprise, because the NVRA "regulates voter registration," not election funding, *see Gonzalez*, 677 F.3d at 402, and nothing about the facts alleged here has anything to do with the subject of voter registration. If anything, given that the NVRA's stated purposes include "mak[ing] it possible for Federal, State, and local governments" to "enhance the participation of eligible citizens as voters in elections for Federal office," *see* 52 U.S.C. § 20501(b)(2), the NVRA's purposes are furthered (not defeated) by local election grants.

Plaintiffs also assert that CTCL's funds "circumvent the EAC and the states and thus conflicts with NVRA." PI Mot. 26. But again, Plaintiffs fail to identify any provision of the NVRA that prohibits localities from obtaining private funds. Plaintiffs have merely observed that federal and state law provide some mechanisms for funding local election administration; they have not identified any statutory indication that those federal and state funding streams are meant to be exclusive of alternative funding sources (which would be surprising, given the established history of local funding in this sphere), nor have they suggested that the receipt of private grants would preempt or defeat the receipt of federal and state funds. There is thus no conflict here.

For those reasons, Plaintiffs' claim that the NVRA preempts Lansing and Flint's acceptance of CTCL's grants is unlikely to succeed on the merits.

### 4.       Section 168.931 of Michigan Election Law

Turning to the only state law they cite, Plaintiffs have not established a likelihood that Lansing and Flint's acceptance of private grants is preempted by §168.931, a criminal misdemeanor statute that provides as follows: "A person shall not, either directly or indirectly,

give, lend, or promise valuable consideration, to or for any person, as an inducement to influence the manner of voting by a person relative to a candidate or ballot question, or as a reward for refraining from voting." As the Supreme Court of Michigan has made clear, this criminal statute, by its plain text, is violated only where an offer of "valuable consideration" is made "expressly contingent" on and "in exchange for [a] favorable vote" (or promise to refrain from voting). *See St. Joseph Twp. v. City of St. Joseph*, 373 Mich. 1, 6–7 (1964) (construing § 168.931(a)).

There is no credible basis for concluding that private grants to fund city-wide election administration program offend this prohibition on criminal vote buying. CTCL's grants are not given to "a person" as that term is used in the statute.[10] And they certainly are not given to "influence the manner of voting by a person *relative to a candidate or ballot question*, or as a *reward for refraining from voting*." Mich. Comp. Law §168.931 (emphasis added). Plaintiffs cite no cases at all in support of their § 168.931(a) argument—much less a case standing for the outlandish proposition that a city violates a voter bribery statute by accepting grant money to fund election administration *in general*, without any reference to a particular candidate or ballot question. Nor do Plaintiffs offer any allegations or evidence that CTCL's grants are expressly (or impliedly) conditioned on votes for or against any candidate or proposition. That is because no such evidence exists: CTCL's grants are offered with the sole purpose of ensuring that all voters in Lansing and Flint are able to vote—for whomever they like—safely and securely during a deadly pandemic.

For these reasons, Plaintiffs cannot establish a likelihood of success on their argument that § 168.139 preempts or otherwise forecloses Lansing and Flint's acceptance of CTCL's grants.

---

[10] Plaintiffs cite no authority for the proposition that Cities are persons in this context. Mich. Comp. Laws § 168.3 (Definitions; terms commencing "l" to "r"). And it would be strange for "persons" to include cities when cities cannot engage in "voting," which is the entire focus of §168.931.

### 5.   Public-private partnerships, generally

Plaintiffs broadly argue, based on premises ostensibly emanating from some combination of the Elections Clause, the Supremacy Clause, and the rest of the Constitution, that public-private partnerships are inherently unconstitutional in local election administration. This argument is not likely to succeed on the merits. Not only do Plaintiffs fail to identify any constitutional basis for this theory, but the cases they invoke to support it are wholly inapposite. *See* PI Mot. 16-19.

*Young v. Red Clay School District*, for example, did not involve a public-private funding agreement or a federal election. 122 A.3d 784 (Del. Ch. 2015). Instead, *Young* involved a strategic effort by a school district to encourage voting by residents deemed likely favorable toward its preferred outcome—all while discouraging voting by those it suspected would oppose its preferred outcome. *Id*. This case is nothing like *Young*. Plaintiffs have not plausibly alleged, much less proven through evidence, that a similar dynamic exists here. There is no evidence that Flint or Lansing have applied for the grants, or intend to use them, in any sort of inequitable manner. And CTCL's grants are available to all jurisdictions on an objective, nonpartisan basis; Lansing and Flint are just 2 of the 381 municipalities in Michigan alone that have thus far received funding from CTCL. (Ex. 7, CTCL Statement on the Amistad Project, PDF, https://www.techandciviclife.org/wp-content/uploads/2020/10/10.5.2020-Amistad-Project-1.pdf.) Even if the legal principles articulated in *Young* retain vitality and fit this setting,[11] there is no conceivable basis for finding a violation.

The three other cases that Plaintiffs cite are even less relevant—and, like *Young*, none of them address a public-private partnership or permissible sources of election funding. Two of their

---

[11] Among other features distinguishing *Young* from this case, *Young* involved an interpretation of the *Delaware* Elections Clause, which the court expressly noted was "separate from and more protective of electoral rights than the implied federal regime." 122 A.3d at 810.

cases do not involve elections of any sort or any other topic relevant to this case. *See Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994) (Establishment Clause); *Ferguson v. City of Charleston*, 532 U.S. 67 (2001) (Fourth Amendment). The third case does involve judicial elections, but in the context of judicial recusal under the Due Process Clause. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). Put simply, Plaintiffs cite no authority remotely suggesting that a private grant accepted for politically neutral election-administration purposes is unconstitutional. They cannot prevail on the merits of this claim.

Because Plaintiffs lack Article III standing, lack a cause of action to pursue their claims, and advance theories that do not withstand scrutiny, they cannot show that they are likely to succeed on the merits. Their motion for a preliminary injunction should therefore be denied.

## II. Plaintiffs cannot show a likelihood of irreparable harm and the remaining equitable factors weigh heavily against granting a preliminary injunction.

An independent basis for denying Plaintiffs' motion is their failure to demonstrate a likelihood of irreparable harm or entitlement to relief under the remaining equitable factors.

### A. Irreparable harm

Plaintiffs are unlikely to suffer irreparable harm in the absence of a preliminary injunction for the same reasons that they cannot establish Article III standing. *See supra* 11-14. The harms that Plaintiffs allege are abstract, rely on a speculative chain of inferences, and are contradicted by the available evidence. *See id.*; *see also Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Although Plaintiffs claim that "infringement on the fundamental right to vote constitutes irreparable injury," PI Mot. 29-30, they have not argued—and cannot demonstrate—that Flint or Lansing's acceptance of election-administration grants will somehow infringe on their personal right to vote. Plaintiffs nowhere allege that this conduct somehow makes it harder for them to vote.

The truth is that Plaintiffs—like all residents of Lansing and Flint—stand to *benefit* (not suffer) from the additional resources for safe and efficient voting provided by CTCL grant.

> ## B.      The balance of the equities and the public interest

While Plaintiffs will not be injured if this Court denies a preliminary injunction, many others will be worse off if the Court grants one. That is true partly because Plaintiffs delayed in filing suit. The balance of the equities and the public interest thus favor denial of Plaintiffs' motion.

At this late stage, prohibiting Lansing and Flint from using the grants that they have received from CTCL would cause harm to voters, poll workers, and orderly election administration in both cities. Election administrators have already committed and spent 70% (Lansing) and roughly one-quarter (Flint) of grant funds.  (Ex. 8, Lansing Decl. ¶ 10; Ex. 9, Flint Decl. ¶ 13.) Those funds are necessary to support nonpartisan administrative expenses. An order requiring Lansing and Flint to *stop* spending the funds would disrupt all of these ongoing efforts, as outlined in the declarations and Safe Voting Plans.   (Ex. 8, Lansing Decl. ¶ 12; Ex. 9, Flint Decl. ¶¶ 11, 14.)

Granting Plaintiffs the relief they seek would be so disruptive partly because Plaintiffs sat on their hands for weeks after Lansing and Flint made public their acceptance of CTCL's grants (on September 14 and 16, respectively). (Ex. 8, Lansing Decl. ¶ 8; Ex. 9, Flint Decl. ¶ 9.) Plaintiffs could have filed suit sooner. They could have raised their concerns through appropriate channels sooner. They could have filed a written notice of their complaint with the relevant state election official under the NVRA sooner. But instead they waited weeks—in which time it was entirely foreseeable that the funds would be spent or obligated—before rushing into court. Equity protects those who diligently seek to protect themselves. Plaintiffs did not conduct themselves consistent with that principle and so they are not entitled to equitable relief. *See Parker v. Dacres*, 130 U.S.

43, 50 (1889) (noting "the principle upon which courts of equity uniformly proceed, independently of any statute of limitations, of refusing relief to those who unreasonably delay to invoke their aid").

A final consideration weighs against granting Plaintiffs' motion: the *Purcell* principle. As the Supreme Court recently noted in *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020) (per curiam): "[L]ower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). The reasons underlying *Purcell* apply with full force here. Lansing and Flint have designed their election administration plans in reliance on the availability of the grant funding that Plaintiffs seek to kick out from under them mere weeks before November 3, 2020. An order disrupting those expectations will require significant, last-minute modifications to election systems in both cities. Given the manifest weakness of Plaintiffs' case, as well as the frailty of their alleged irreparable harm, allowing Lansing and Flint to proceed with the orderly operation of their elections is unquestionably in the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully Submitted,

By:    /s/ *Christopher M. Trebilcock*
Christopher M. Trebilcock (P62101)
Vincent C. Sallan (P79888)
Clark Hill PLC
500 Woodward Avenue – Suite 3500
Detroit, Michigan 48226
(313) 965-8300
ctrebilcock@clarkhill.com
vsallan@clarkhill.com
*Attorneys for Defendants*

DATE:  October 13, 2020

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that she electronically filed the foregoing document with the Clerk of the Court through means of the Case Management Electronic Filing System on **October 13, 2020**, who will send notification of such filing to all parties and/or attorneys of record for all parties to the above case at their respective addresses and as indicated on the pleadings.

*/s/ Pamela Bright*
Pamela Bright
